Technology, Inc. v. KPMG and Roth Capital First, we'll hear from Mr. Ruhlman. May it please the Court. Good morning. Thank you for giving me the opportunity to address you on this matter. As an initial matter, I think it's important to keep in mind the confines of what we're talking about in this appeal today, which is what is within the four corners of the contract. All the parties have agreed, and both judges who have ruled on this matter have found that the contract is unambiguous, that no parole evidence should be admitted. It's so unambiguous, no one knows what it means. There is an ambiguity that can be created by lifting a sentence out of the contract and ignoring a defined term in that sentence, which is what has happened and what I'll address. You can create an ambiguity, but if you read the contract as it's written in its entirety and apply the defined terms when you read the contract, the ambiguity disappears. That's where the matter has gone astray and why there's an ambiguity. I want to ask a challenge-all assumptions question. You know, everybody's assuming that because it's a contract interpretation, if it's unambiguous, it's a question of law. I'm a reviewer at De Novo, all of which I understand and agree with. But I wonder if there's a little bit of a different layer here by virtue of the fact that the original agreement had to be approved by the bankruptcy court and that same bankruptcy court then construes the agreement. Does that make any difference to our analysis of it, or maybe should it make any difference, because the bankruptcy court then is sort of part of the formation of the contract by approving it? I'm not aware of any authority that would hold that, Your Honor. The bankruptcy court, when interpreting a contract, one is discerning the intent of the parties in the contract. This contract is not unlike any other contract in that regard. The bankruptcy court did approve it. He found that it was an appropriate commercial transaction and approved it. But his interpretation of the contract, if erroneous and at odds with what the parties expressly agreed to in the contract, would still be subject to De Novo review. But, I mean, without the bankruptcy court's approval, there would be no contract. That's correct. And so if the bankruptcy court approved it thinking that KPMG and Roth would get this bonus if yada yada, then why shouldn't we just go with that? Because it would be contrary to the express intent of the parties. And I don't think the bankruptcy court would even have been in a position to compel a party to do something in the context of the bankruptcy proceedings, which is at odds with what they expressly in the contract agreed they would and would not do. So I wanted to bring up initially that it's important to keep in mind that so much has happened that's outside the confines of the agreement that I hope we can stay confined to the four corners of the agreement. Now, the four corners of the agreement do tell us what was going on here. And very briefly, to give context to do this, obviously Valence was in bankruptcy. It had a large secured debt, which it would have to figure out what it was going to do with that debt and restructure that. It had a lot of experts working on that, the contract says. And it wanted to see if it could raise new money. So they engaged these investment bankers in the engagement agreement. You'll see it's a three-month contract they engaged them for. It was subsequently extended, but it was a three-month contract. It laid out what they were supposed to do, the scope of their duties, which was to, you know, get to a person. Let me ask you this, because I've read through all this. Would this have been a sale transaction fee under Section 4 but for the express, the last part of that definition? The sale is a very interesting point you raise. And so if I could orient us all to the sale transaction, there's a provision in the contract. We're aware of it. Okay. On the sale that provides for a $500,000 fee if there's a sale transaction, but says that it's not going to apply if it's in satisfaction of debt. So this doesn't qualify under — But for that, for Visa, would this have been a sale transaction? I think you can argue that it was because it's a transfer of voting control. In effect, what happened when they gave all this stock was that they transferred majority voting control, which is what the sale provision provides. And the significance of the — to me, the primary significance of the sale provision, in the context of this agreement and the party's intent, is it's the other place where they're talking about something may happen here. It may be a sale. It may be a sale of stock. It may be a sale of all the assets of the company. It may be a sale of voting control. But if any of that happens, the contract consistently says you're not going to get this fee, bankers, if this is just done in exchange for existing debt, because that's just a restructure. But doesn't that show they know how to specifically accept something out? And then they don't use that same language in paragraph 3, so doesn't that lend some credence to KPMG and Roth's arguments? They do specifically take it out in paragraph 3. That's the whole point. What paragraph 3 says, paragraph 3 says, okay, if you succeed, you'll get a success fee, right? Now, the important thing here and what has not been done is to follow — you have to follow the trail of the defined terms. And every time you see the defined term, put it in. And the district court's analysis almost got there, correctly followed through, and then just skipped the last step. And when you look at section 3, you start out with, okay, do they get a success fee? Well, what's a success fee? A success fee is defined. A success fee is a percentage of any private placement value that the bankers may create. They're hired to do a private placement. If they create private placement value for the company, they get — Is there a difference between private placement and private placement value? There is a difference. And I think a fair argument can be made that the transaction that had occurred here was a private placement. I don't think that that's dispositive of the issue. You have to have a private placement that creates private placement value. Where does it say that? Because it says it in paragraph 3C, that a success fee is a percentage of private placement value. But in no event less than a minimum success fee of $500,000. Right. If you had a private placement with no private placement value, wouldn't you be owed $500,000? No, the $500,000 — and I don't think this has been contested. The $500,000 minimum success fee is not — is if you earn a success fee, it will be at least $500,000. It doesn't answer the question of did you earn a success fee. But it says the success fee shall be payable with respect to the private placement upon conservation, not to the private placement value. So — I'm sorry, where? So it says 219 at the bottom, and then it says — so you have your ABC. You were quoting from C. Then two paragraphs down it says the success fee shall be payable. Right. That seems to suggest it's payable on a private placement. And then the question is did there — was there private placement value? And if there wasn't, you still would have the minimum success fee. Half right, with all due respect, Your Honor. To have a success fee, you have to — at all, you have to create private placement value. This is a contingency fee agreement. If you're hired as an investment banker, if you create private placement value for us, we'll give you a success fee. We'll give you a percentage, a cut of the action. You're creating new money. That's what you're hired to do. Here, then, and the parties agreed that the only time that happens is if you create for us private placement value. If all you're doing is we're moving the decks around, the chairs around on the deck, we're restructuring debt, you're not creating any new money for us out of which to take a contingent fee. You've created no private placement value for us. So the parties very clearly defined that success fee is a percentage — has to be a percentage of private placement value. Now, the minimum — Was that clear? I mean, we wouldn't be here. That's part of the problem. I realize nobody thinks this contract's ambiguous, but it's not well written. In retrospect, most contracts I've litigated in my career, when you're focusing in, you can always make an argument that you could put two more paragraphs in and make everything more clear than clear. I argue that this is clear and that the only — where the ambiguity, and Your Honor touched on this from the beginning, it's unambiguous to say in 3C that a success fee is a percentage of private placement value. It's similarly unambiguous to say that private — in the following paragraph, which is defining what private placement value is, that private placement value doesn't include forgiven debt. You're not giving us any new money if we just forgive existing debt. That's not private placement value. There's no dispute that what happened here, the transaction that happened here, falls within the language of excluding any consideration received by the company's creditors in satisfaction of claims or debts. So there's no question that what happened is carved out. Where the ambiguity is created, then, is that the appellees have — the bankers have lifted from the rest of that paragraph the sentence any consideration received from Berg and Berg will be subject to a success fee of 1.25, not 2.5. Now, if you take that sentence out and you don't read the definition of success fee, that sentence is capital S, success, capital F, fee. If you take that out, they say, well, you can read that sentence alone to say any money we get from Mr. Berg or these other five parties, we get a success fee of 1.25 percent. There are two problems with that, and it's not an ambiguity with all due respect. And as I say, the district court came all the way to the end, and I think it's helpful to track through what the district court did. The district court correctly analyzed that if you take that sentence out, you still have to satisfy the fact that you've earned a success fee. As the district court said, you still have to find that there was a transaction that created private placement value. Then the district court just went on and in the next breath said, and this transaction created private placement value without any analysis. And that's where the error was, because to go back up to success fee, it is only a percentage of private placement value. And to look, it's unambiguous that private placement value for this company excluded forgiveness. But don't you have a minimum of $500,000 or a minimum of $500,000? Wouldn't that encompass a situation where you have no value but you do have private placement? No. No, Your Honor, because the minimum success fee just says if you're entitled to a success fee at all, it's going to be this percentage or $500,000, whichever is greater. The minimum success fee just goes to the amount of a success fee if any success fee is earned. You don't get to the success fee, the contingency fee. You don't get to that unless these bankers assisted in closing a transaction that created some private placement value for the company. I mean, the whole contract was structured from the beginning, carved out from the banker's duties, was we don't want you to do any debt restructuring work. You're not going to do that. And carved out expressly in the private placement fees and in the sales fees, carved out both places, is the fact that if we do any of these transactions and all we're doing is a reorganization of debt, we're not creating private placement value for the company. There's no new money. You're not going to get paid for it. You're going to get your $30,000, but you're not going to get your contingency. I'm going to ask because it seems like, you know, you read a contract in whole and if language is used in one place but not elsewhere and you're saying success fee with capital S and all that has to be construed a certain way. If you look at this paragraph 4, it's very clear. First of all, it says you don't get both a private placement fee and a sale transaction fee, and it has this provided that language, a sale transaction shall not include. So you knew how to be clear in paragraph 4, and that's missing from paragraph 3, which to me lends support to the idea that KPMG and Roth are entitled to something, be it the minimum $500,000 or this 1.25% of the $50 million. Your Honor, if you look at the definition of private placement value in paragraph 3, it just as clearly excludes any consideration received by the company's creditors in satisfaction of claims or debts existing on the date hereof. This was such a transaction. Therefore, it is crystal clear that this transaction did not create private placement value. I had a question about that. It said excluding any consideration received by the company's creditors. So are you saying that that means we exclude the value of the stock? No. What the company's creditors, in this case Mr. Berg or Bergen Berg, received stock in satisfaction of existing debts. That's what I'm asking. So we look at excluding any consideration received by the company's creditors. We're talking about the value of the stock they received. Right, which is the only thing that's at issue on this appeal. And the value of that stock was $51 million. Fifty. Fifty million. Well, the value, that was what it was exchanged for, $50 million. That's how you'd read it. I'm just asking how you'd read that. So you agree there was a private placement? I'll agree for the sake of argument, yes. And that the aggregate, then we exclude from that private placement the $50 million of stock. Right. And that leaves us with what dollar amount? Well, that's the only piece that's at issue in the appeal. There were three parts to the transaction. No, I know. Let's assume we're not arguing about the loan. Right. There's $19 million of debt still left. Nobody's saying that should earn anything. So excluding the $20 million loan, just looking at the equity transaction. Right. So if we subtract $50 million from $50 million, you've got zero. Right. There's zero private placement. So there was no private placement value. Correct. And your argument is they get 1.25% of zero. Correct. Because there was no private placement value, and the success fee is just a contingency fee if you create private placement value, just like, you know, contingency fees in other circumstances. I expect there will be argument about parole evidence and so forth, which I'll address on reply. And I think I'd just be belaboring the points. I mean, you're centered in on the contractual language, so I will proceed to the other side at this time. Okay. Good morning, Your Honor. May it please the Court. My name is Eric Talb from Austin, Texas, and I represent KPMG Finance, LLC, who prevailed at the Bankruptcy Court and the District Court. And we are splitting our time with Roth Capital Partners. I'm going to focus on the circumstances surrounding the execution of this agreement. I'd like to address the issue that Judge Haines raised with regard to Judge Gargata and Judge Gargata's interpretation. Ms. Wilson is going to focus more on the rules of statutory construction and how they're applied at the contract terms. We believe and suggest to the Court that the contract provision awarding KPMG and Roth 1.25% of the $50 million paid or exchanged by Berg and Berg, an identified party specifically identified in this contract, is appropriate under the circumstances, and that Judge Gargata, the bankruptcy judge who approved the retention, administered the bankruptcy case and approved the plan and awarded the fees to both Roth and KPMG for the reasons that we argue here is correct. Do we give any deference to the judge, or is it a de novo review? Your Honor, I think it's a de novo review, but I think what Judge Gargata did in approving the contract is he used the rules of statutory construction in the approval process, which he also used in the ultimate award of the fees. I do think specifically because Judge Gargata had to approve the contract and had to interpret the contract in that approval process, that his view of the statutory construction as to how these specific versus general terms were applied should be given some deference. Well, that's not de novo. That's de novo but. Well, I think it is de novo from the standpoint of how the contract and the statutory provisions should be interpreted in the context of when they were presented to the court. I'm just wondering whether the bankruptcy court, by virtue of having to approve this, gains some greater stake in this than the typical court would have in construing a contract. I think it does, and I think it's part of the argument that I'd like to go into a little bit about why the circumstances surrounding the execution of the contract. I just need a statutory provision before you get into facts. Tell me a statutory provision that says, gives us some overlay, that it's not de novo review based on contract like. I don't believe there is any statutory provision that says that per se. I think the court's approval, in other words, all contracts specifically. You're saying since it's the bankruptcy court, we give deference to his de novo review. I think, Your Honor, that because the approval of the contract under Section 328, 11 U.S.C. 328, is done by the bankruptcy court, that that approval process, his view of what he approved, should be given some deference, but I don't have any other statutory basis. Where's the case that says that? I'm sorry, Your Honor? Where's the case that says that? I'm not currently aware of a case that says that specifically, Your Honor. I think it's just a matter of the approval process of 11 U.S.C. 328. Your Honor, circumstances surrounding the execution of an agreement is not plural evidence. Under New York law, it is clear that a contract should be given its plain meaning, given due consideration to surrounding circumstances and the apparent purpose which the parties sought to accomplish. We've cited the Palmieri v. Allstate case, the Thompson case, and also, as was cited by the district court, the cable service case for that proposition. Even Schroen, the case cited by Valance, actually considers the circumstances surrounding execution of the agreement, such as the history of the parties and the sophistication of the parties. And in that case, although the Court determined that extrinsic evidence of the parties' actual subjective intent was not permissible, the Court did examine the circumstances surrounding the execution of that agreement to determine what the parties' intent was, not based upon parole evidence, but based upon those circumstances. The same versus Atwater v. Panama Railroad Company, which is another case. Does the case boil down to what we believe any consideration received from Berg and that, because they make this argument about guess somebody's correct weight and win a big stuffed toy, any guess of a family member's weight earns a small toy, not a big one, and they said your construction would be, I can just guess my family member weighs 500 pounds, even though they weigh 100, and win a small toy. It doesn't have to be a correct guess. That's how they're viewing your construction here. What is your response to the fact? I don't think that's where the contract reads at all. And actually, if the Court looks at paragraph 3, the idea that private placement value had to be determined I think is wrong. So if paragraph 3 of the, and specifically paragraph 3C of the contract is examined, the term success fee is defined as an additional fee. In other words, 3C says an additional fee defined the, quote, success fee, and then goes on to talk about the circumstances where that additional fee might be determined at 2.5 percent under a certain private placement, and then also talks about the minimum success fee. If you go to the paragraph following, what it says is in the specific statutory, the specific contractual language that's used, it says any consideration received from Bergen Berg and other affiliated parties will be subject to a success fee defined in paragraph C as an additional fee of 1.25 percent and not 2.5 percent, but still subject to the minimum success fee. But does that relate back to the immediately preceding sentence that says we exclude any consideration from creditors, or is it a new sentence and sort of like the small toy and big toy analogy? I think it's a new sentence, Your Honor. I think it's specific. It doesn't relate back specifically to private placement. So how would you have drafted this to relate it back? How would you have drafted this to make it read the way Valence says it reads? Fair question, Your Honor. What I would have said is any consideration from Bergen Berg, excluding any consideration received by the company's creditors in satisfaction of claims or debts existing on the date hereof, shall be subject to a success fee. That doesn't seem right. That seems awkward to have to say it twice in two sentences in the same paragraph. I think, Your Honor, what the – it's clear from the circumstances and the party's intent is that the success fee defined as an additional fee was going to be paid if there was consideration from Bergen Berg. Why would they agree to that? Why would they agree to that? Simply because, Your Honor, that was the likely result, and no entity, no sophisticated entity like KPMG would have walked in and spent the considerable time and effort – Well, that's just restructuring the debt. I mean, why would you hire KPMG and Roth to go in and restructure the debt – A very simple answer, Your Honor. – when the agreement says we're not going to – you're not hired to do that? I think the very simple answer is what happened here. It validated the transaction that Mr. Berg wanted to accomplish. Remember that at the time of the bankruptcy filing, Bergen Berg was owed $90 million, was the largest majority stockholder, and Mr. Berg sat as chairman. If the intent was to have a transaction with a restructure where Bergen Berg wiped out all of the existing minority shareholders, which is what happened, and then converted his secured debt, or partially secured and partially unsecured, to equity, then it was a way of validating and demonstrating to the bankruptcy court that the transaction that he proposed was the right value and was fair and equitable. And, in fact, Judge Gargatta, in the hearing on January 19th, specifically commented in interaction with counsel for valence where he said everybody knew from the beginning of this case that equity was out of the money and that unless you had Mr. Berg's control – Mr. Berg's cooperation and his control, this case was DOA. There was nothing that was going to happen, and this matter was over. I thought that's why these people were brought in, to see if there were some outside investors, and they actually brought two proposals to the board, and they rejected it. It was not to bring it in just to get more – get money out of Berg. I mean – No, that's right, Your Honor. It wasn't. This would have resulted whether you hired KPMG or Roth or not. I mean, so that's why it doesn't make sense to me. I think what it did was for Mr. Berg in achieving that goal, it validated the pricing of the transaction when he ended up controlling all of the equity. In other words, and I do think it is interesting if you think about what actually occurred, which is represented in the disclosure statement that was approved by the board, what happened is there were offers to come in and provide new equity to take out the creditors, to pay money to the creditors. That actually – those offers were recommended by the CEO but were rejected by Mr. Berg and his board. So the purpose of it was to validate the transaction that actually occurred, which was one of the only two things that could have occurred from the beginning of the case. Valance suggests – In another way, once Berg found out other people wanted it, it was more valuable to him. And it allowed him to validate his conversion of debt to equity at that price because there were other offers that made that number appear to be a valid number so that the court would approve it. You're exactly correct. And I think it's also somewhat interesting that if you look at the brief that Judge Gargata, who approved it and interpreted it and granted it, and Judge Yackel did, was to suggest, well, that surely one of the possibilities was that Mr. Berg, who was already owed $90 million of debt and had all of the – or a majority of the equity, he was going to come in and take new money out of his pocket and he was going to make a new equity contribution. In other words, that's what really this specific provision, the lower fee, was designed to do. Well, that's just absurd. There's no way in the world that that was going to happen based on those circumstances, not with $90 million worth of debt, which $40 million based upon the valuation that was provided to the court in the disclosure statement was actually secured, and $40 million was unsecured. There is no possible way that Mr. Berg was going to create and provide new equity that was financially – would have been financially irresponsible in suicide. Everybody knew that. Berg knew it. The debtors knew it. KPMG knew it. And Roth knew it. So why isn't this all parole evidence that we're not supposed to be considering? Why is this legitimate to consider in addressing this de novo deferential review we're doing? Because it is all circumstances that relate to what was present, all of the factors, the debt factors, the equity factors, the control factors, the court's observation about what the case was like at the time that these contracts were approved. They're all circumstances surrounding the execution of the agreement, which the case law suggests should be consulted to determine, in addition to the four corners of the instrument, the party's intent and subject to the various rules of construction for looking at an unambiguous contract. That's why I think it's all admissible and why the case law suggests that you don't just look in a vacuum and you have to look at the subjective – the circumstances surrounding the execution to avoid what the New York courts also suggest would be observed result here is that everybody having known what the circumstances were, the debt, the control, the equity position, that KPMG and Roth would have signed up to get a success fee, if you will, that would have been absolutely impossible. Relative to, like, hours worked, how can we weigh this? I mean, in other words, I'm thinking $30,000 at KPMG or Roth probably doesn't buy a whole lot of hours. What – can you give me – is there any evidence that we can look at that would help us understand relative to what – how much work they put into it, what they're getting? The simple answer is, in the record, Your Honor, the only thing that's there, because this was a section 328 employment and nonemployment under 327, where hours have to be kept and there's that type of analysis. There is a reference in the approved disclosure statement that says KPMG and Roth worked long and hard. This was the disclosure statement promulgated by the debtor. Long and hard is about the best that we can provide to the Court. I'm not sure that's the specific reference, Your Honor. But there is a reference in the disclosure statement which is part of our briefing. But there's not any quantum of hours, 50 versus 100 versus 1,000? No. And the long and hard refers to this transaction, not the other two that were turned down? I mean, we're talking about overall all the work that was done or specifically to this transaction? No, Judge Prado. It actually refers to the other parts that they did, which I suggest to the Court, led to the approval of this transaction. In other words, soliciting, bringing other offers to the table as they were requested to do. Without the other suitors, there wouldn't have been this wedding? Yes, ma'am. That's correct. Just to be clear, KPMG nor Roth did any contacting or work with Bergenberg to get this deal done? In all honesty, Your Honor, I don't know that's the case. I don't think that would be the case. I actually think what they did was they worked with these other parties to validate the transaction that Bergenberg ultimately pushed through in contravention of what their CEO suggested they pursue. Thank you, Your Honor. Thank you. Ms. Wilson. Good morning. May it please the Court. I am going to talk about statutory or, I'm sorry, the contractual construction as Mr. Todd indicated. But I do want to briefly start just by touching on your last question, Judge Haynes, where you asked if there's anything in the record that can tell us how much work KPMG and Roth did in this case, trying to find a third-party investor. And I would point the Court to page 9 of Roth's brief, where we cite to page 349 of the record on appeal, which is part of the approved disclosure statement. This is a statement that is proffered and promulgated by the debtor and approved by the bankruptcy court in trying to solicit approval for the plan. And what valence represented to the Court and to all the interested parties was that during the process of trying to get a third-party investor, the debtor contacted 32 financial and 74 strategic investors, sent management presentations to 13 entities, and conducted diligence reviews with five strategic investors. So more than $30,000 worth of hourly rate. Certainly more than $30,000 worth. And for a comparison, because approval of... I say that. I mean, at $300 an hour, that's 1,000 hours of work. At $600 an hour, that's still 500 hours. That's a lot of hours. No, it's 100 hours at $300 an hour. At $300... Oh, I'm sorry. Yeah. Okay. Gotcha. Because compensation under 328 is based on a reasonableness standard and not a lodestar hourly times rate, just to compare, if the $72 million third-party investment that was presented to the board and recommended by the CEO, if that transaction had been consummated instead of this debt-for-equity swap, the success fee for KPMG and Roth would have been approximately $1.8 million. Each? Each. That would have been the 1.25%, as opposed to the $625 less the $30,000 that they had already retained, which is what is being requested and which has been approved by both the bankruptcy court and the district court. Let me ask you something on this construction of the contract. If we were to determine that your clients, the two companies, are only entitled to the minimum success fee, is that a flat $500,000 or is that $500,000 minus $30,000? I believe that would be $500,000 minus the $30,000. Okay. I don't know that it's explicit in the contract, and honestly it's not something that anybody had argued or said that we've really looked at, but I think that consistent with the subtraction of the retainer and the initial fee from a larger percentage success fee, I think it would be consistent to subtract that $30,000 from the minimum. Okay. And, I mean, the reason it could come up is if we were to conclude that there was a private placement that created no private placement value and that private placement, pursuant to this, the success fee shall be payable with respect to the private placement language, is what triggers the fee, then that would yield the minimum success fee. It's not anything anybody's argued, but we've all heard this is de novo and we're the novos. That's true. And that is another path, if you're just walking through the defined terms, that instead of saying that your success fee, if your private placement value is zero, your success fee is 1.25% of zero, that it's the minimum success fee, that is a way to get there. But I think that the easier or perhaps the better analysis is that you don't even have to start there because the any consideration language is more specific than the language that precedes it. Do you want to offer your rewrite to get? So you're now hired to represent Valence in the future to get these things right. How would you rewrite this second sentence to avoid the mishap as they see it? You take out the second sentence completely. If you take out that second sentence. But you want to get to this one point. The notion is if this private placement value is created with Berg, we don't want to pay 2.5, we want to pay 1.25. How would you rewrite this to accomplish what Valence said they were trying to accomplish, which is a success fee on Berg only if there's new money and not stock for debt. And on this new money, we only want to pay 1.25 rather than 2.5 because this isn't a wholly new guy that you had to go out and get. I think you would have to write it the way that Mr. Taube suggested also, which is including that exclusion of consideration for preexisting debt again in the second sentence. But as he explained that, it doesn't really. How about this provided that language that you have in paragraph 4, in section 4, provided that there the sale transaction, but here it could be the success fee, which shall not include the yadda, yadda, yadda. Or you could potentially use that provided that language in the definition of private placement or private placement value. But, again, given – Well, they think they did use it on private placement value because they say it excludes debt retired by consideration. Right. And the – but the next sentence is more specific. Well, how do you answer this guessing the weight analogy? Guess someone's correct weight and win a big stuffed toy. Any guess of a family member's weight earns a small toy, not a big one. Does that mean I can just guess my family member's weight at 500 pounds and win a small toy even though they weigh 100 pounds? I don't think so. I think, quite frankly, Your Honor, I think it's kind of a silly analogy. And I think it's because – Well, I liked it. So you've got to address me at least for one vote. No. I understand. The reason I think it's kind of a silly analogy is because it presumes, as does their entire statutory construction argument, that everybody is ignoring all the circumstances and kind of everything that you know bringing to the table when you're constructing your contract. And walking down the boardwalk, if you're going to play this game, their analogy doesn't make sense. It makes sense that you wouldn't get to say, oh, I think my husband weighs 400 pounds when clearly he's, you know, my husband's a skinny guy. He weighs about 180 pounds. And then I get to say, well, I get a small toy because I guessed his weight. It's not battery operated with lithium batteries, the toy. No, I mean, these are much more – I hope not. So you think the context there would be so inconsistent with the analogy that it's not a helpful analogy. Exactly. The presumption that you could walk up, make a completely wild guess that you know is completely inaccurate. I think that's the thing. A guess that you know is completely inaccurate and still get a prize. Maybe a better analogy for me would be we're not giving everybody participation trophies here. I think that's how they view our argument, is that we're standing up and saying, well, we showed up. We showed up for practice. We showed up for the games. We weren't very good, which I would argue is not true. I think KPMG and Roth did a good job, and the debtor thought that KPMG and Roth did a good job. Without your help, the transaction that ultimately occurred would not have occurred? No. Without Roth and KPMG, that transaction most likely would have occurred. But to satisfy 1129A7 and get the plan approved and show that the creditors were getting more from this transaction than they would in a Chapter 7 liquidation, they needed some numbers. So it wouldn't have occurred. I mean, in other words, they could have wanted to do it, but it wouldn't have gotten approved. It could have gotten approved. Well, then what value – I mean, you just argued against yourself. What value did you all add if everything would have happened just as it did? That's Valens' point. You guys are coming in and taking money for nothing. I thought your colleague said, well, we did all this, and without that it wouldn't have happened. But now you're saying it would have happened. I can't say that with or without that, that we were the only catalyst or the only support. Valens could have tried to make an argument. Look, no one else wants this, and the equity must be worth $50 million because he's already put $90 million in. They may have been able to drum up some other evidence. But in bankruptcies of companies this size, it is, I would suggest, the best practice to really expose it diligently and aggressively to the marketplace so that when you come back to the court and say, please approve my restructuring plan, you can say this is the best deal my creditors are going to get. That's what keeps holding me up here. You just said when you go back to the bankruptcy court and ask them to approve the restructuring plan, well, this agreement specifically says that Roth and KPMG were not hired to restructure or give advice or represent in the bankruptcy regarding restructuring. And now you're saying that's exactly what they were hired to do, to go out and create this value so that you could come into the bankruptcy court and argue on this Berg deal that it was a good restructuring thing. You meet yourself coming around, it seems to me. No, I think the exclusion from the scope of duties in the restructuring means that KPMG and Roth are not going to negotiate with Berg to determine the amounts or the structure of the restructuring. They're not going to draft the plan. They're not going to draft the disclosure statement. They're not going to do all the exhibits that are necessarily part of the plan, like the liquidation analysis. They're not going to do any of the work to do the consummation documents. But they did all the work so that the other lawyers could argue in the bankruptcy court that the value of the Berg and Berg transaction was good. Yes. And this isn't unusual in bankruptcy. I just don't see where the agreement says that. That's fine. You don't see where the agreement says that they have to? We're hired to augment the bankruptcy restructuring. And I think that goes back to, again, what we were talking about before and what Valance wants to call parole evidence, is that this is the universe that these bankruptcy professionals operate in, and it's kind of an understood rule in the bankruptcy universe that if you want to do a restructuring and you want to do a debt-for-equity swap, you're going to have to show the court that you're giving the creditors at least as good a deal as they would get in a Chapter 7 liquidation. Why not just pay an hourly rate to these guys? If all they're doing is going around trying to hokey up deals that will look good to get the ultimate restructuring done, why not just charge an hourly rate? That seems like what that is rather than a success fee, which suggests you need to go be successful. Because the hourly rate, I think, could get astronomical, and it could get astronomical in a case where maybe you don't get enough money to really pay for it. Well, there are Valances saying they didn't get enough money to pay for this because all they got was nothing. They got a cancellation of debt. They didn't get money in their pockets, so they're having to go and root around in the ground to find the money to pay you guys if we affirm this. Respectfully, Your Honor, actually the Valance representative said they had $2 million from the $20 million new infusion of operating capital to pay professional fees. Yeah, but that's not the $50 million we're talking about. They're saying we got nothing out of the $50 million. We had anticipated, in the typical contingency fee in a personal injury case, car wreck is settled for $100,000, the lawyer gets a third, so he gets $33,000 out of a check written by the defendant. And here there's no check written by the defendant analogy for the $50 million. That's what they're saying. So there's nothing to kind of take the contingency out of. What's your response to that? My response is that in the disclosure statement and plan, the debtor represented to the court, we are going to pay professional fees out of the operating capital we got. Which is the $20 million loan. Exactly. It's debt, not equity. It's debt, but to me that's an admission that they owed professional fees, including the investment banker's fees, which is also the testimony of the CEO. They had other professionals, right? They had the guys who wrote the restructuring deal. So saying I owe professional fees doesn't mean I owe your professional fees. It means I owe somebody's. But there was undisputed testimony at the January 16th to January 17th hearing by the debtor's former CEO, I believe, that said the debtor intended to pay KPMG and Roth. The debtor thought they owed that money. And that was, I think, part of the $2 million. That being the $625,000 or that being the $30,000? The $30,000 had already been paid. So that was the $625,000 minus the $595,000. I'm running very short of time. I didn't really get to the construction, which I apologize for. Give us your best. What do you want us to walk away from your argument with? Give us that in the 42 seconds. The circumstances of the case when they're aligned with the rules of contract construction, as recognized by the New York courts and applicable here, make KPMG and Roth's interpretation of the contract, which is the same as the bankruptcy court, the same as the district court, the more reasonable and appropriate interpretation. You're saying it's ambiguous. No, it's not. Then why does more reasonable matter? If they're both reasonable, then it's ambiguous. It makes it the correct response. I don't think you can apply all the circumstances and all the facts of this case to the New York rules of construction and come up with what valence has presented to this court, and for that reason we would ask the court to affirm. Thank you. Mr. Roman. Thank you, Your Honor. I'd like to address the minimum success fee issue quickly first. Nobody's argued it. There's an admission in the record when there was testimony from the appellee's witness at 618 of the record that this is just a floor once a success fee is earned. Right. Which is the way that it is. So would you subtract the 30? If we were to for some reason decide that a minimum success fee was owed, and I know you don't agree with that, but if we did, should we subtract the 30,000 from it, or is it an absolute floor? You should not subtract the 30,000 from it if you were to decide that, because there are three categories of payment, 15 up front, 15 after a month, and then if you get a success fee. If you were to interpret it the way you are, it's in addition to the two 15s. Needless to say, we don't agree with that interpretation. So there's the admission and there's the language of the contract itself, which I think if you just take the time to read 3C, you will see that it doesn't come into play at all unless there's a success fee earned. A second issue that Your Honor raised was asking questions about the reasonableness and how much work they had done and so forth, inquiry in that area. I would point out there are two standards under which professionals can be, and this is in the briefing, under which professionals can be appointed. One, and I always get, I'm not a bankruptcy lawyer, one's 328 and one's 330, and I get them mixed up. 330, I believe, is the one that allows for the court to make determinations as to the reasonableness of a fee when it's interpreting the fee. That one is not. No, I mean, clearly it rises or falls on this contract construction. My point was simply if we're looking at the surrounding circumstances, if we're imagining how much work is likely to be involved and is $30,000 going to compensate for that and then this other thing is really kind of a windfall, an incentive fee, or is this other thing really like you had to go to trial on the car wreck and so you really need this money to make up for the time. It was more to try to understand that. I agree. They're not going to win or lose based on that. Okay. But would you answer the question of what is wrong with the argument that there was a private placement, it did not yield a private placement value, and therefore the minimum success fee is owed? Because success fee is always a percentage of the private placement. But I say it's simply an additional fee because that's where the quote success fee close quote ends. Yes, but it says it's an additional fee, which is an amount equal to a percentage of the private placement value as defined below, but in no event less than a minimum success fee of 500. The minimum amount, if the parties wanted to accept your interpretation of that agreement, you would just have a provision that, A, you get 15,000 immediately, B, you get 15,000 in a month, and, C, you get at least 500,000 no matter what happens. And that's clearly not what the contract says. The contract says you get an additional success fee if there's private placement value. Were there other creditors of the company besides this specific listing here on below C, the Bergenberg and Johnson Controls and so on? Were there other creditors? Interestingly, I don't know the answer to that. I wasn't involved in the bankruptcy. But there's no suggestion in 3C that any of those other entities are creditors. I mean, those are all parties. You know, the suggestion that was made in argument that Mr. Burke would have never put in any new money, Mr. Burke put in $20 million of new money. Had they structured this deal so that the $20 million of new money was in if the contract said that the stock he got was also in consideration for that amount, there would have been a success fee on the $20 million, right? It would have qualified because it would have been in exchange for equity. It would have been an equity transaction, which is what this covers. But that didn't happen. So we have six parties here who were potential investors, which is why, but they were already known. So, you know, the investment bankers were hired to go out and beat the bushes and find potential investors. We already know these people, so we're not going to give you a full contingency fee if we close a deal with these six people. But don't we need to know if there's other creditors to understand whether their construction would render that clause meaningless, excluding any consideration? Because if the only creditors of Valence are Burke and Burke, so on and so forth, then their construction renders this excluding any meaningless. But if there's other creditors, then their construction is a possible one. There certainly were other creditors in the bankruptcy. One thing I do know, for example, is our firm was a creditor in the bankruptcy. There were certainly other creditors in the bankruptcy. Whether they were secured creditors in the position of Burke and Burke in a position of trading and coming under the agreement because they're making equity trades and so forth, I don't know the answer to that. Thank you. Thank you, Mr. Ruhl. Thank you as well, Counsel. And court will be in session.